UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF CROSBY                    CIVIL ACTION
MARINE TRANSPORTATION, L.L.C.,
*et al*.                                     NO. 17-14023 c/w 18-4136

                                            SECTION M (4)
                                            *Pertains to all cases*

## ORDER & REASONS

Before the Court is a motion by claimants Angela Huggins, Kathy Randle, and Anna Clark (collectively, "Claimants") for partial summary judgment seeking dismissal of defendants' government contractor immunity defense.[1]  Defendants Atlantic Specialty Insurance Company, Markel American Insurance Company, State National Insurance Company, Navigators Insurance Company, United States Fire Insurance Company, Mitsui Sumitomo Insurance Company of America, Swiss Re International SE, and the following Certain Underwriters at Lloyds Syndicates: 1206 ATL, 1897 SKD, 1183 TAL, 2007 NVA, 0382 HDU, 1274 AUL, 0510 KLN, 1861 ATL, 1967 WRB, 0780 ADV, 1225 AES, 0033 HIS (collectively, "Underwriters"), jointly with Crosby Marine Transportation, LLC, Crosby Tugs, LLC, Bertucci Contracting Company, LLC, Crosby Dredging, LLC, Chris Carter, and Derek Hebert (collectively, "Crosby," and together with Underwriters, the "Crosby interests") respond in opposition.[2]  Claimants reply in further support of their motion.[3]  Also before the Court is the Crosby interests' cross-motion for summary judgment seeking a dismissal of all claims against them as barred by the government contractor immunity defense.[4]  Claimants oppose the cross-motion,[5] as do third-party defendants Tracker

---

[1] R. Docs. 315; 317.
[2] R. Doc. 318.
[3] R. Doc. 323.
[4] R. Doc. 324.
[5] R. Doc. 358.

Marine, LLC, Tracker Marine Group, White River Marine Group, Tracker Marine Retail, LLC, and Kenner Manufacturing Co., Inc. (collectively, "Tracker").[6]  The Crosby interests reply in further support of their cross-motion.[7]  Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons holding that the Crosby interests have not identified reasonably precise specifications approved by the government as would support a government contractor immunity defense.

## I.    BACKGROUND

This matter concerns a maritime collision.  The accident occurred on November 19, 2017, when a recreational boat hit Crosby's vessel and tow,[8] which was pushed up against the bank and blocking a portion of Bayou Segnette.[9]  At the time of the accident, Crosby's vessel was working on a United States Army Corps of Engineers ("USACE") project.[10]

In March 2017, the USACE awarded a contract to BIS Services, LLC, for a hurricane restoration project in Jefferson Parish known as the Yankee Pond Project, which involved moving sediment and other materials from Lake Cataouatche through the Bayou Segnette waterway and depositing the materials in Yankee Pond to build up the marsh.[11]  BIS Services subcontracted with Crosby Dredging for dredging services on the project, and Crosby Dredging, in turn, subcontracted with Crosby Tugs for tug operations on the project.[12]  Crosby Dredging employed two of its own dredges – Dredge 7, located in Yankee Pond, and Dredge 8, in Lake Cataouatche.[13]  In September 2017, Crosby captain Chris Carter began working on the Yankee Pond Project and was assigned

---

[6] R. Doc. 356.
[7] R. Doc. 377.
[8] R. Doc. 315-1 at 5.
[9] *Id.*
[10] R. Doc. 309 at 2.
[11] R. Doc. 315-1 at 2.
[12] *Id.*
[13] *Id.*

to the *Delta Duck*, an inland pushboat used to push barges through Bayou Segnette between Dredge 7 and Dredge 8.[14]

On the evening of November 18, 2017, Carter received clearance to push Bertucci Barge 708 from Dredge 7 to Dredge 8.[15] Earlier that evening, Carter learned of an approaching cold front that would change the winds from a southerly direction to a strong northerly direction.[16] Despite advance warning of the imminent front, he decided to proceed toward Lake Cataouatche through Bayou Segnette.[17] While en route, Carter decided to push the tow against the west bank of Bayou Segnette due to increased wind speeds and changing weather conditions.[18] At midnight, the *Delta Duck*'s watch changed, and mate Derek Hebert assumed the helm of the tug.[19] When Hebert came on watch, the head of Barge 708 was nosed up against the bank and the stern of the tug was 90 feet from the bank, thereby blocking about 35% of Bayou Segnette.[20] For the entire time Barge 708 was thus situated, neither the *Delta Duck* nor the barge displayed red and green navigational lights, and the barge displayed no white all-around light.[21] However, the *Delta Duck* used its work lights to light up the tug and the deck barge.[22]

On the morning of November 19, 2017, at approximately 4:00 a.m., a 22-foot Fishmaster recreational vessel, piloted by Chad Williams, headed south along Bayou Segnette.[23] Angela Huggins, Anna Clark, and Samantha Randle were passengers in the boat.[24] As the boat approached the intersection of Bayou Segnette and Tar Paper Canal, it struck Bertucci Barge 708, which was

---

[14] *Id.* at 3.
[15] *Id.* at 4.
[16] *Id.*
[17] *Id.*
[18] *Id.* at 4.
[19] *Id.* at 5.
[20] *Id.*
[21] *Id.*
[22] R. Doc. 324-1 at 4 (citing R. Doc. 324-2 at 27).
[23] R. Doc. 315-1 at 5.
[24] *Id.*

still pushed up against the west bank of Bayou Segnette.[25]  Huggins and Clark suffered severe injuries, and Randle was killed.[26]

Crosby Tugs and Bertucci Contracting filed this limitation-of-liability proceeding in December 2017.[27]  Huggins answered and filed claims against both limitation petitioners and against Crosby Dredging and Underwriters.[28]  In April 2019, the Court issued a scheduling order establishing June 2, 2019, as the deadline for amending pleadings.[29]

Well after this deadline, in July 2020, the Crosby interests sought leave to amend their answers to add the government contractor immunity ("GCI") defense, claiming they first realized the potential for this affirmative defense on September 5, 2019, after the corporate deposition of Crosby Tugs, whereupon they immediately began the process of adding the defense.[30]  The magistrate judge denied the motion for leave, finding that the Crosby interests failed to demonstrate good cause to warrant the tardy amendment of their answers.[31]  Additionally, the magistrate judge deemed the proposed amendment to be futile.[32]  However, this Court sustained the Crosby interests' objection to the magistrate judge's order, concluding that they had demonstrated (1) good cause to amend their answers to add the defense despite expiration of the scheduling order's deadline and (2) that the amendment would not be considered futile at the amendment stage of the litigation.[33]  In doing so, the Court observed: "Claimants may still seek

---

[25] *Id.*
[26] *Id.* at 6.
[27] R. Doc. 1.
[28] R. Docs. 7; 51.
[29] R. Doc. 195.
[30] R. Doc. 268.
[31] R. Doc. 279 at 5-10.
[32] *Id.* at 10-16.
[33] R. Doc. 309.

dismissal of the affirmative defense, whether by way of a motion for summary judgment or other motion, as they deem appropriate at a later time."[34]  That time has now come.

## II.    PENDING MOTIONS

In their motion for partial summary judgment seeking dismissal of the Crosby interests' GCI defense, Claimants first argue that a collision between two vessels on navigable waters is not the kind of action that gives rise to such a defense because the government would not be immune from liability for damages arising out of maritime collisions.[35]  Claimants then urge that the Crosby interests cannot establish the GCI defense under the framework set out in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), because (1) Crosby did not conform to the government's "reasonably precise specifications" in that it failed to implement provisions of the BIS Accident Prevention Plan and provisions of USACE Safety Manual 385-1-1, and in that Crosby Tugs violated provisions of the Inland Navigation Rules, and (2) the Crosby entities failed to warn the government of dangers associated with their violation of navigation rules and nonconformance with reasonably precise specifications.[36]

In opposition to Claimants' motion and in support of their cross-motion for summary judgment, the Crosby interests argue that the *Boyle* factors are satisfied to warrant their GCI defense.[37]  First, they argue that the USACE approved reasonably precise specifications, having actually created the project's plans rather than just "rubber stamping them."[38]  Second, they argue that Crosby Tugs' work at all times conformed to the USACE's plans and specifications, as

---

[34] *Id.* at 12.
[35] R. Doc. 315-1 at 6-11.  In opposing this aspect of Claimants' motion, the Crosby interests argue that under both the Suits in Admiralty Act and the Public Vessels Act (which Claimants cite for their position), the Claimants' exclusive remedy lies against the United States, not a private contractor like Crosby.  R. Doc. 318 at 3-6.  In their reply, Claimants concede that the provisions of these Acts do not apply to this litigation.  R. Doc. 323 at 4-5.  Hence, the Court need not address this question.
[36] R. Doc. 315-1 at 11-23.
[37] R. Docs. 318 at 6-7; 324-1 at 6.
[38] R. Docs. 318 at 7-9; 324-1 at 6-8.

5

governed by the USACE's safety manual, because Crosby Tugs complied with the applicable navigation rules and because the USACE did not issue a notice of non-compliance when provided with a detailed explanation of the events surrounding the incident.[39]  Third, the Crosby interests argue that the USACE was aware of the dangers associated with the Yankee Pond Project because the USACE itself warned Crosby numerous times about the potential hazards posed by recreational boat traffic on Bayou Segnette.[40]

In opposing the Crosby interests' motion for summary judgment and in further support of their own motion, Claimants clarify that they intended to argue only that a government contractor can enjoy no greater immunity than does the government itself.[41]  Next, Claimants contend that the Crosby interests do not adequately refute the Claimants' evidence showing that Crosby violated federal regulations and failed to implement reasonably precise specifications.[42]  Claimants point to expert testimony reviewing multiple navigation rules said to have been violated by Crosby and its failure to adhere to the accident prevention plan and safety manual.[43]  In addition to these arguments, Tracker urges that "the government did not provide reasonably precise specifications pertaining to the negligent acts of Crosby."[44]  In particular, Tracker asserts that "[t]he USACE project plans do not provide any specific instruction with respect to operation of Crosby vessels, much less specific instruction to perform the acts claimants allege were negligent."[45]

---

[39] R. Docs. 318 at 9-14; 324-1 at 8-12.
[40] R. Docs. 318 at 14-16; 324-1 at 12-13.
[41] R. Doc. 323 at 4-5.
[42] R. Docs. 323 at 5-9; 358.
[43] R. Doc. 358 at 2-7 (citing R. Docs. 358-1; 358-2).
[44] R. Doc. 356 at 1, 4-12.
[45] *Id*. at 7.

### III.    LAW & ANALYSIS

#### A.  Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id.*  A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact.  *Id.* at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact.  *Id.* at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1996).  The substantive law identifies which facts are material.  *Id.*  Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *EEOC v. Simbaki, Ltd.,* 767 F.3d 475, 481 (5th Cir. 2014).  Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment.  *See Anderson,* 477 U.S. at 249-50; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank,* 16 F.3d 92, 97 (5th Cir. 1994).  In ruling on a summary-judgment

motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,* 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton,* 572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington,* 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little,* 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.,* 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden. *See Celotex,* 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little,* 37 F.3d 1075-76.

**B. The Government Contractor Immunity Defense**

Government contractor immunity is an affirmative defense. As such, on cross-motions for summary judgment, the Crosby interests must prove that they are entitled to its protection; and if

they succeed, the burden shifts to Claimants to raise a genuine issue of material fact regarding the applicability of the GCI defense.  *See Smith v. Xerox Corp.*, 866 F.2d 135, 137 (5th Cir. 1989).

"Government contractor immunity is derived from the government's immunity from suit where the performance of a discretionary function is at issue." *Kerstetter v. Pac. Sci. Co.,* 210 F.3d 431, 435 (5th Cir. 2000) (citing *Boyle*, 487 U.S. at 511).  For example, the Supreme Court has observed that the government's selection of the appropriate design for military equipment to be used by the armed forces constitutes a discretionary function.  *Boyle*, 487 U.S. at 511.  Under *Boyle*, the GCI defense may be asserted by a government contractor or supplier if it can establish that (1) the government approved reasonably precise specifications; (2) the equipment or work conformed to those specifications; and (3) the contractor or supplier warned the government about any dangers in the equipment or work that were known to the contractor or supplier, but not to the government.  *Kerstetter,* 210 F.3d at 435; *see Boyle,* 487 U.S. at 512.

The first prong of the *Boyle* test has two components: (1) the existence of reasonably precise specifications; and (2) government approval of those specifications.  *In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 461 (5th Cir. 2010).  These two components together are intended to "assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself." *Boyle*, 487 U.S. at 512.  The requirement of reasonably precise specifications must apply to the specific feature at issue in the claim.  *In re Katrina*, 620 F.3d at 461.  Reasonably precise specifications for only one aspect of a large project do not create an umbrella of protection for an entire project.  *Id.*  In this case, the specific feature at issue is whether the government provided reasonably precise specifications regarding the actions of Crosby and its pushboat, barge, and crew, along the Bayou Segnette waterway.

The Crosby interests argue generally that the USACE approved the pertinent specifications for the project because they were actually created by the USACE, not merely "rubber stamped."[46] The Crosby interests argue further that the plans and specifications are precise because they are included in a 270-page document containing "extremely precise specifications on both safety and the actual scope of the work."[47]  While the USACE approved certain specifications detailing the manner and form by which Crosby should carry out the Yankee Pond Project,[48] there are several factors that render those specifications either irrelevant or imprecise in the context of the GCI defense interposed by the Crosby interests under the facts and circumstances of this case.[49]

First, the specifications regarding navigation hazards were not reasonably precise concerning how Crosby (including Crosby Tugs and its crew) should act to prevent marine collisions, like the one at issue, during transit of the Bayou Segnette waterway.  Section 3.4.4, on "Navigation Hazard," in the USACE document titled *Marsh Creation at Yankee Pond and Geo-Crib (Jefferson Parish, Louisiana): Construction Solicitation and Specifications* ("USACE Yankee Pond Specifications"), states:

> Project vicinity is used by both recreation and commercial fisherman [*sic*], eco-tourism boat tours, recreation, and other commercial floating craft.  Small boats often use the Bayou Segnette Waterway and adjacent lakes during early hours and late evenings during little to no sunlight.  Contractor shall be ever vigilant to prevent small boat navigation impacts.[50]

---

[46] R. Doc. 318 at 8.

[47] *Id.* at 9 (citing R. Doc. 318-4, which it describes as the "contract specifications").

[48] Thus, the document does contain specifications of the kind more typically confronted in conjunction with the assertion of a GCI defense including, for example, the appropriate composition of the fill material to be used in building up the marsh, the prescribed placement of the fill in the marsh, and the like.  But none of these provisions applies to the specific feature at issue in the claim – namely, the navigational and operational decisions concerning the pushboat and barge.

[49] In their reply, the Crosby interests observe that Claimants admit "that the first *Boyle* factor is satisfied," *i.e.*, that the USACE "issued reasonably precise specifications," R. Doc. 377 at 2, while noting that "Tracker argues that the first *Boyle* factor is not satisfied."  *Id.* at 4.  Given the conflict, the Court undertakes a full analysis of the issue notwithstanding Claimants' stated position.

[50] R. Doc. 318-4 at 246.

The USACE specifies that the contractor shall be "ever vigilant," but it provides no further elaboration on the ways or means by which Crosby should execute said vigilance.  In the context of marine navigation, this language constitutes more of a warning than it does a specification of any navigational step or action.  The lack of precision in this paragraph, even if considered a specification, means that Crosby, in its discretion, could take whatever step or action it believed vigilance required "to prevent small boat navigation impacts."  This does not align with the "requirement that the specifications be precise mean[ing] that the discretion over significant details and all critical design choices will be exercised by the government."  *Kerstetter*, 210 F.3d at 438; *see also Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1479 (5th Cir. 1989).  There is nothing in the USACE Yankee Pond Specifications indicating that the government exercised any discretion or influence over either the significant details involved in Crosby's navigation of Bayou Segnette with a tow or the critical choices left to Crosby to avoid navigation hazards during its transit of the bayou.

In contrast, consider *Guarisco v. Boh Brothers Construction Co.*, 421 F. Supp. 3d 367 (E.D. La. 2019), a case involving plans and specifications provided to Boh Brothers Construction Company in conjunction with a USACE-sponsored construction project.  Boh Brothers was engaged to complete a flood prevention project on New Orleans city streets.  *Id.* at 372.  The USACE provided Boh Brothers with specifications regarding traffic control and coordination, the traffic plan, road closure, as well as the use of barricades, and danger, warning, and detour signs. *Id.* at 376.  The USACE also gave detailed and precise specifications for the exact placement of traffic signs and the method of properly conducting lane closures.  *Id.*  The court in *Guarisco* found that the USACE's plans and specifications governing traffic flow were reasonably precise and satisfied the first *Boyle* factor.  *Id.*  This level of specification is absent in the case at bar because

the USACE did not provide Crosby with any direction concerning specific navigational steps or actions, or a precise method, to avoid navigation hazards during transit.  In particular, the USACE Yankee Pond Specifications did not tell Crosby or its crew to shelter its tows from bad weather by nosing up to the west bank of Bayou Segnette.  These decisions involved the discretionary acts of Crosby and its crew.

Second, the specifications regarding signal lights were not reasonably precise to address the situation when a barge is pressed up against the bank of a bayou.  Section 30, on "Signal Lights," in the general provisions of the USACE Yankee Pond Specifications, provides:

> The Contractor shall display signal lights and conduct his/her operations in accordance with U.S. Coast Guard regulations governing lights and day signals to be displayed, as set forth in Commandant, U.S. Coast Guard Instruction M16672.2C, Navigation Rules, International - Inland (COMDTINST M16672); 33 CFR 81, Appendix A (International); and 33 CFR 84 through 33 CFR 90 (Inland) as applicable.[51]

Crosby Tugs' corporate representative, Monty Wade Savoy, Jr., described in his deposition his understanding of the Coast Guard regulations regarding the required lighting for barges pushed against the bank of a bayou.  In general, Savoy was aware that the barge was supposed to be equipped with navigation lights.[52]  But when asked what type of light, he responded: "To this day, we still can't get a straight answer from the Coast Guard as to what are we considered when we are pushed against the bank."[53]  For barges being pushed ahead, Savoy did indicate he was aware that green and red sidelights were required at a minimum.[54]  He also indicated he understood that

---

[51] *Id.* at 82.
[52] R. Doc. 315-6 at 3.
[53] *Id.* at 4.  The inland rules provide different nighttime-recognition lighting configurations for barges being pushed ahead by a vessel underway as compared to barges that are moored, aground, or at anchor.
[54] *Id.*

a center flashing light was required, but he could never get the Coast Guard to confirm such a requirement.[55]

As is evident from Savoy's testimony, the lighting requirements in the inland navigation rules promulgated by the Coast Guard were considered to be incorporated into the USACE Yankee Pond Specifications.[56]  This is not enough, though, to satisfy the first prong of *Boyle* under the circumstances of this case.  Because mariners are subject to the navigation rules in any event, this action would be akin to a contract, like the one in *Guarisco*, incorporating all traffic laws into its specifications – essentially doing nothing more than requiring by contract what was already required by law.  The Court doubts whether this constitutes the kind of "reasonably *precise* specification" the Supreme Court envisioned as a prerequisite for triggering the GCI defense.  After all, if a collision involving a government vessel resulted from its breach of the navigation rules, the government is not immune from liability for its negligence.  *See, e.g., Brand v. United States*, 2017 WL 1736801 (D. Ariz. May 4, 2017); *Maritime & Mercantile Int'l L.L.C. v. United States*, 2007 WL 690094 (S.D.N.Y. Feb. 28, 2007); *cf. Garcia v. United States*, 986 F.3d 513 (5th Cir. 2021) (government not liable for death of swimmer struck by Coast Guard vessel, but not because of immunity).

Regardless, the specifications at issue here are in no way reasonably specific enough to address the particular circumstances at issue – namely, the lighting requirements for a barge pushed up against the bank of a bayou mid-transit, thereby blocking a significant portion of the waterway. The lighting requirements of the inland navigation rules identified by the Crosby interests speak specifically to when a barge is "underway" as part of a tow.  In his deposition, Savoy indicated that when the barge was being pushed back and forth between Dredge 7 and Dredge 8, it was

---

[55] *Id.* at 3.
[56] *Id.* at 4.

considered underway.[57]  Savoy acknowledged that when the barge was underway, its red and green

navigation sidelights must be enabled under the rules.[58]  Savoy concluded, however, that when the

barge was eventually pushed up against the bank, Crosby and its crew were in a gray area as to

whether the barge was considered underway or moored[59] and, hence, what lighting requirements

applied.[60]

The USACE Yankee Pond Specifications do not address at all – much less with reasonable

precision – the navigational maneuver to be taken by a Crosby captain in the face of adverse wind

and weather conditions while transiting the Bayou Segnette waterway.  They do not direct that the

barge is to be nosed onto the bayou's bank to protect the tow under such circumstances.  Nor do

they address the status of a barge pushed onto the bank – that is, whether it is considered underway,

moored, aground, or at anchor – so as to dictate what signal lights the barge was to display.  As

with the "navigation hazard" provision, the "signal lights" provision of the USACE Yankee Pond

Specifications does not align with the "requirement that the specifications be precise mean[ing]

that the discretion over significant details and all critical design choices will be exercised by the

government." *Kerstetter*, 210 F.3d at 438; *see also Trevino*, 865 F.2d at 1479.  The specification

that Crosby was to heed the inland navigation rules (which Claimants contend Crosby did not[61])

simply does not of itself delineate the lighting requirements for barges pushed against the bank of

a waterway for several hours at night, and so this provision cannot constitute a reasonably precise

specification for this situation.  Instead, the Crosby captain, not the government, was vested with

the discretion to interpret the inland navigation rules as best he could to choose to display the signal

---

[57] *Id.* at 17.

[58] *Id.* at 17-18.

[59] R. Doc. 324-5 at 9.

[60] R. Doc. 315-6 at 17-18.  Claimants contend that if the tug and tow were not underway, but moored, then the barge was required by the inland navigation rules to display two white all-around lights.  R. Doc. 315-1 at 13-14, 16-17.

[61] R. Doc. 358 at 2-3.

lights, if any, he thought proper under the circumstances.[62]   Savoy admitted as much in his deposition.[63]

Concerning the specifications on navigation hazards and signal lights, the question is not whether the government approved of *any* aspect of Crosby's decisions but whether reasonably precise specifications applied to the specific feature at issue in the claim.   *In re Katrina*, 620 F.3d at 461, 464.   Thus, the proper question is whether the government approved reasonably *precise* specifications, such that it is apparent that the government was the main instrument of decision concerning any action taken to avoid a navigation hazard or to display signal lights by the barge pushed up on the bayou's bank the night of the accident.   *Id.*   "If the government approved imprecise or general guidelines, then discretion over important design [in this case, ship handling and lighting] choices would be left to the government contractor."   *Id.* (citing *Trevino,* 865 F.2d at 1481).   Because the USACE, at best, provided only general instructions about these matters (*e.g.*, the route to be transited), discretion over the means and methods chosen was left in Crosby's hands.[64]   And Crosby's exercise of its discretion is not protected by the GCI defense.

Third, Crosby was not acting in accordance with any USACE specifications when Carter decided to push the barge against the bank due to the inclement weather.   In his deposition, Carter claimed that he pushed barges against the bayou's banks many times while working on the project between September and November 2017.[65]   When he did, it was on account of weather or to allow traffic through the bayou.[66]   Carter testified that there was a verbal understanding between all the

---

[62] For example, the discretion exercised by Crosby's captain is evident in his decision not to activate the red and green sidelights on the barge due to the slippery condition of its decks during dredging operations.  R. Doc. 318-at 12-13 (discussing Crosby's interpretation of Inland Rule 24).  It cannot be said that this discretion was vested in or exercised by the USACE.

[63] R. Doc. 315-6 at 4, 17-18.

[64] R. Doc. 356 at 2-3, 7.

[65] R. Doc. 315-7 at 20.

[66] *Id.*

captains on the project to not continue through the bayou if the wind speeds exceeded 20 miles per hour.[67]   However, Carter also indicated that there was nothing in writing memorializing this understanding and no directive from Crosby commanding the captains to cease operations in high winds.[68]   The designated representative of the USACE, Stephen Hinkamp, testified that while Crosby did not require clearance from the USACE to push barges against the bank of the bayou during periods of bad weather, Crosby did not request clearance from the USACE to do so.[69]   When asked if the USACE would be concerned about the safety of the pushed-up tug and tow's obstruction of navigation in the waterway, Hinkamp stated that the decision to park the barges along the bayou was "Crosby's call" exclusively.[70]   Further, Hinkamp stated that the USACE was not aware that from September to November 2017, Crosby would push barges against the west bank of the bayou.[71]

The USACE Yankee Pond Specifications contain no provision addressing steps to be taken by a Crosby tug and tow during inclement weather.  And the deposition testimony of Carter and Hinkamp confirms that the USACE did not provide to Crosby any reasonably precise specifications regarding what it should do with its tugs and tows during inclement weather.  Thus, in making these decisions, Crosby was acting at its own discretion and not pursuant to any government directive.  Because the decision of Crosby and its captain to push the barge against the bayou's bank to protect against the weather was their own, not the government's, Crosby is not protected by the GCI defense.

---

[67] *Id.* at 23.
[68] *Id.* at 24.
[69] R. Doc. 315-8 at 10.
[70] *Id.*
[71] *Id.* at 32-37.

In sum, given the absence of reasonably precise specifications approved by the USACE, the Crosby interests fail the first step of the *Boyle* test and are not entitled to the GCI defense with respect to the November 2017 accident.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Claimants' motion for partial summary judgment (R. Doc. 315) is GRANTED, and the Crosby interests' GCI defense is dismissed with prejudice.

IT IS FURTHER ORDERED that the Crosby interests' motion for summary judgment (R. Doc. 324) is DENIED.

New Orleans, Louisiana, this 6th day of May, 2021.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE