UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF CROSBY
MARINE TRANSPORTATION, L.L.C.,
*et al*.

CIVIL ACTION

NO. 17-14023 c/w 18-4136

SECTION M (4)
*Pertains to all cases*

## ORDER & REASONS

Before the Court is a motion for summary judgment filed by third-party defendants Tracker Marine, LLC, Tracker Marine Group, White River Marine Group, Tracker Marine Retail, LLC, and Kenner Manufacturing Co., Inc. (collectively, "Tracker Marine").[1]  Third-party plaintiffs Crosby Marine Transportation, LLC, Crosby Tugs, LLC, the *M/V Delta Duck*, Bertucci Contracting Company, LLC, the Barge BBL 708, Crosby Dredging, LLC, the Dredge 7 and Dredge 8, Chris Carter, and Derek Hebert (collectively, "Crosby"), jointly with Atlantic Specialty Insurance Company, Markel American Insurance Company, State National Insurance Company, Navigators Insurance Company, United States Fire Insurance Company, Mitsui Sumitomo Insurance Company of America, Swiss Re International SE, and the following Certain Underwriters at Lloyds Syndicates: 1206 ATL, 1897 SKD, 1183 TAL, 2007 NVA, 0382 HDU, 1274 AUL, 0510 KLN, 1861 ATL, 1967 WRB, 0780 ADV, 1225 AES, 0033 HIS (collectively, "Underwriters," and together with Crosby, the "Crosby interests") respond in opposition,[2] and Tracker Marine replies in further support of its motion.[3]  Having considered the parties'

---

[1] R. Doc. 350.
[2] R. Doc. 381.
[3] R. Doc. 386.

memoranda, the record, and the applicable law, the Court issues this Order & Reasons granting Tracker Marine's motion.[4]

## I. BACKGROUND

This matter concerns a maritime collision. The accident occurred on November 19, 2017, when a recreational boat hit Crosby's vessel and tow,[5] which was pushed up against the bank and blocking a portion of Bayou Segnette.[6] At the time of the accident, Crosby's vessel was working on a United States Army Corps of Engineers ("USACE") project.[7]

In March 2017, the USACE awarded a contract to BIS Services, LLC, for a hurricane restoration project in Jefferson Parish known as the Yankee Pond Project, which involved moving sediment and other materials from Lake Cataouatche through the Bayou Segnette waterway and depositing the materials in Yankee Pond to build up the marsh.[8] BIS Services subcontracted with Crosby Dredging for dredging services on the project, and Crosby Dredging, in turn, subcontracted with Crosby Tugs for tug operations on the project.[9] Crosby Dredging employed two of its own dredges – Dredge 7, located in Yankee Pond, and Dredge 8, in Lake Cataouatche.[10] In September 2017, Crosby captain Chris Carter began working on the Yankee Pond Project and was assigned to the *Delta Duck*, an inland pushboat used to push barges through Bayou Segnette between Dredge 7 and Dredge 8.[11]

---

[4] Tracker Marine filed two separate *Daubert* motions seeking to exclude the Crosby interests' liability expert, Nicholas Engels, and their expert ophthalmologist, Dr. Clifford A. Hendricks. R. Docs. 343 & 344. Because this Court grants Tracker Marine's motion for summary judgment without having to consider the expert testimony, the *Daubert* motions (R. Docs. 343 & 344) are dismissed as moot.
[5] R. Doc. 315-1 at 5.
[6] *Id.*
[7] R. Doc. 309 at 2.
[8] R. Doc. 315-1 at 2.
[9] *Id.*
[10] *Id.*
[11] *Id.* at 3.

On the evening of November 18, 2017, Carter received clearance to push Bertucci Barge 708 from Dredge 7 to Dredge 8.[12] Earlier that evening, Carter learned of an approaching cold front that would change the winds from a southerly direction to a strong northerly direction.[13] Despite advance warning of the imminent front, he decided to proceed toward Lake Cataouatche through Bayou Segnette.[14] While en route, Carter decided to push the tow against the west bank of Bayou Segnette due to increased wind speeds and changing weather conditions.[15] At midnight, the *Delta Duck*'s watch changed, and mate Derek Hebert assumed the helm of the tug.[16] When Hebert came on watch, the head of Barge 708 was nosed up against the bank and the stern of the tug was 90 feet from the bank, thereby blocking about 35% of Bayou Segnette.[17] For the entire time Barge 708 was thus situated, neither the *Delta Duck* nor the barge displayed red and green navigational lights, and the barge displayed no white all-around light.[18] However, the *Delta Duck* used its work lights to light up the tug and the deck barge.[19]

On the morning of November 19, 2017, at approximately 4:00 a.m., a 22-foot Fishmaster recreational vessel, piloted by Chad Williams, headed south along Bayou Segnette.[20] The Crosby interests maintain that Williams, who had spent the night and early morning hours drinking alcohol, was impaired at the time of the accident.[21] Angela Huggins, Anna Clark, and Samantha Randle were passengers in the boat.[22] As the boat approached the intersection of Bayou Segnette

---

[12] *Id.* at 4.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.* at 5.
[17] *Id.*
[18] *Id.*
[19] R. Doc. 324-1 at 4 (citing R. Doc. 324-2 at 27).
[20] R. Doc. 315-1 at 5.
[21] R. Doc. 340-1 at 3 (citing R. Doc. 340-6 at 4-5).
[22] R. Doc. 315-1 at 5.

and Tar Paper Canal, it struck Bertucci Barge 708, which was still pushed up against the west bank of Bayou Segnette.[23] Huggins and Clark suffered severe injuries, and Randle was killed.[24]

The Crosby interests maintain that the placement of the Fishmaster's all-around navigation light contributed to the accident.[25] The vessel was manufactured and sold by Tracker Marine in 2004.[26] When the Fishmaster left Tracker Marine's factory, it had an all-around navigation light on a 54-inch light pole affixed to the center console, which configuration complied with applicable standards promulgated by the National Marine Manufacturer's Association, the American Boat & Yacht Council, and the United States Coast Guard.[27] In 2015, Claude Toups purchased the Fishmaster from a friend and allowed his son-in-law, Williams, unfettered access to the boat.[28] At some point, Williams replaced the original all-around navigation light assembly with a light pole measuring 44½ inches.[29] On the night of the accident, Williams noticed that the replacement all-around navigation light was flickering, so he zip-tied an Attwood clamp-on portable LED light kit to the 44½-inch light pole.[30] Williams testified at his deposition that neither the fixed replacement all-around navigation light nor the temporary zip-tied light was shining in his eyes or impairing his vision at the time of the accident.[31]

Crosby Tugs and Bertucci Contracting filed this limitation-of-liability proceeding in December 2017.[32] Eventually, the Crosby interests filed a third-party complaint and Rule 14(c) tender against Tracker Marine asserting claims under the Louisiana Products Liability Act

---

[23] *Id.*
[24] *Id.* at 6.
[25] R. Doc. 220.
[26] R. Doc. 350-1 at 2.
[27] *Id.* at 3 (citing R. Doc. 350-5).
[28] *Id.* at 2-3; R. Doc. 245-2 at 1-2.
[29] R. Doc. 350-1 at 5 (citing R. Doc. 350-6)
[30] *Id.* (citing R. Doc. 350-6).
[31] *Id.* (citing R. Doc. 350-6).
[32] R. Doc. 1.

("LPLA"), La. R.S. 9:2800.51, *et seq.*, and for redhibition.[33] With respect to the LPLA claim, the Crosby interests allege that the Fishmaster was unreasonably dangerous in design due to the placement of the all-around navigation light on the center console instead of the stern, and that Tracker Marine failed to provide an adequate warning that the all-around navigation light should not be replaced with a shorter pole or a non-anti-glare bulb.[34] With respect to the redhibition claim, the Crosby interests allege that the placement of the all-around navigation light pole made the boat so inconvenient that a reasonable person would not have bought it and, thus, Toups is entitled to recover for damage to the vessel or other economic losses he has sustained.[35]

## II.     PENDING MOTION

Tracker Marine argues that it is entitled to summary judgment dismissing the Crosby interests' LPLA claim because there is no evidence that the accident occurred as a result of the reasonably anticipated use of the 54-inch all-around navigation light pole.[36] Indeed, that light pole was no longer on the vessel at the time of the accident because Williams had replaced it with a 44½-inch pole.[37] Moreover, when the accident occurred, Williams was relying on a portable light zip-tied to the replacement pole.[38] Tracker Marine argues that the dangers posed by using a shorter replacement pole and a zip-tied temporary light were open and obvious to Williams, an experienced boater.[39] As to the redhibition claim, Tracker Marine argues that there is no evidence

---

[33] R. Doc. 220.
[34] *Id.* at 7-10.
[35] *Id.* at 11-12.
[36] R. Doc. 350-1 at 16-21.
[37] *Id.*
[38] *Id.*
[39] *Id.*; R. Doc. 386 at 2-6. Tracker Marine also argues that there is no competent evidence that the accident and resulting damages were caused by the all-around navigation light on the Fishmaster because Williams testified that the light was not impairing his vision, nor is there any evidence of a design defect or inadequate warning. R. Doc. 350-1 at 21-32. The Court need not address these arguments because it holds that there was no reasonably anticipated use.

5

that the 54-inch light pole in place when the Fishmaster left its custody rendered the boat unusable or inconvenient.[40]

In opposition, the Crosby interests argue that Tracker Marine knew that the Fishmaster's component parts, including the all-around navigation light pole, would need to be replaced at some point during the vessel's useful life and it should have anticipated that a boat owner might not fully understand or appreciate the potential danger of replacing the original pole with a shorter one that did not have an anti-glare light.[41] The Crosby interests maintain that the placement of the all-around navigation light rendered the Fishmaster unreasonably dangerous in design, and that Tracker Marine failed to provide an adequate warning regarding replacement of the all-around navigation light pole.[42]

### III.  LAW & ANALYSIS

#### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id.* A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and

---

[40] *Id.* at 33-35.
[41] R. Doc. 381 at 2, 11-15.
[42] *Id.* at 4-6, 15-17. The remainder of the Crosby interests' arguments concern whether the light was shining in Williams's eyes and impairing his vision, *id.* at 6-10, which are issues the Court need not reach given its disposition of the motion on other grounds.

identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id.* at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id.* at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). The substantive law identifies which facts are material. *Id.* Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014). Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary-judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting,

competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

### B. The Louisiana Products Liability Act

The LPLA prescribes "the exclusive theories of liability for manufacturers for damage caused by their products." La. R.S. 9:2800.52. Under the LPLA, a plaintiff may only recover against a manufacturer "for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity." *Id.* 9:2800.54(A). The statute further limits recovery for damage resulting from "unreasonably dangerous" characteristics to four theories of liability: (1) unreasonably dangerous in construction or composition;[43] (2) unreasonably dangerous in design;[44] (3) unreasonably dangerous for failure to provide an adequate warning;[45] and (4) unreasonably dangerous for nonconformity to an express warranty.[46] *Id.* 9:2800.54(B). The unreasonably dangerous characteristic "must exist at the time the product left the control of its manufacturer." *Id.* 9:2800.54(C). The plaintiff bears the burden of proving each

---

[43] *See* La. R.S. 9:2800.55.
[44] *See id*. 9:2800.56.
[45] *See id.* 9:2800.57.
[46] *See id.* 9:2800.58.

8

of these elements of an LPLA claim. *Id.* 9:2800.54(D); *see also Johnson v. Transwood, Inc.*, 2015 WL 5680369, at *3 (M.D. La. Sept. 25, 2015) (an unreasonably dangerous condition is not presumed solely because an injury occurred).

"'Reasonably anticipated use' is the threshold LPLA element." *Matthews v. Remington Arms Co.*, 641 F.3d 635, 641 (5th Cir. 2011). Without a reasonably anticipated use, a court need not analyze whether the product was unreasonably dangerous under one of the LPLA's four theories of liability. *Id.* The LPLA defines "reasonably anticipated use" as "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." La. R.S. 9:2800.53(7). The Louisiana supreme court has explained "reasonably anticipated use" as follows:

> Notably, [the LPLA's] definition [of "reasonably anticipated use"] is narrower in scope than its pre-LPLA counterpart, "normal use," which included "all reasonably foreseeable uses and misuses of the product," but, like "normal use," what constitutes a reasonably anticipated use is ascertained from the point of view of the manufacturer at the time of manufacture. Unlike its "normal use" counterpart, though, the use of the words "reasonably anticipated" effectively discourages the fact-finder from using hindsight.
>
> "Reasonably anticipated use" also effectively conveys the important message that "the manufacturer is not responsible for accounting for every conceivable foreseeable use" of its product. Likewise, "knowledge of the potential and actual intentional abuse of its product does not create a question of fact on the question of reasonably anticipated use."

*Payne v. Gardner*, 56 So. 3d 229, 231 (La. 2011) (internal citations omitted).

Applying this standard, the Crosby interests must produce sufficient evidence that, at the time of manufacture, Tracker Marine should have reasonably expected that an ordinary consumer or user of its Fishmaster vessel would replace its original 54-inch all-around navigation light pole with a shorter pole and then zip-tie a temporary light to that replacement pole at a height that would impair his vision. *See id.* The Crosby interests have produced no such evidence. They instead

argue that Tracker Marine should have expected that an end-user would need to replace the navigation light pole eventually and should have passed on the pole manufacturer's warning that the pole should be replaced with one at least as long as the existing one and that an anti-glare light should be used so that it does not impair the operator's vision.[47] It is unclear whether the pole manufacturer's warning accompanied the Fishmaster when it left the showroom, but it is undisputed that Toups (who was not the original owner) and Williams never received it.[48] Regardless, "[e]ven if the warning did not reach the users, if the danger from a particular use of a product is obvious, then it is not a 'reasonably anticipated use' under the LPLA." *Spears v. Cintas Sales Corp.*, 414 F. App'x 667, 669 (5th Cir. 2011) (quotation omitted). Here, Williams's replacing the all-around navigation pole with a shorter one that did not have an anti-glare light, and more importantly, zip-tying a temporary light to that pole right in his field of vision, as alleged by the Crosby interests, is certainly an obvious danger, and thus, not a reasonably anticipated use of the product. *Id.* (affirming summary judgment for manufacturer because welder's use of the uniform at issue was not a reasonably anticipated use under the LPLA in that the danger of exposing the uniform to flammability risk was obvious). Because use of the product was not reasonably anticipated, Tracker Marine is entitled to summary judgment on the Crosby interests' LPLA claim.

    C. **Redhibition**

Under Louisiana law, sellers impliedly warrant buyers against redhibitory defects, or vices, in the thing sold. La. Civ. Code art. 2520. A seller is liable to a buyer for a redhibitory defect when: (1) the thing the seller sold is either absolutely useless for its intended purpose or its use is so inconvenient or imperfect that had the buyer known of the defect, he or she would not have

---

[47] R. Doc. 381 at 5.
[48] *Id.* at 5-6.

purchased it; (2) at the time of the sale, the thing sold contained a defect that was neither known nor apparent to the buyer; and (3) the seller was afforded an opportunity to repair the defect. *See Alston v. Fleetwood Motor Homes of Ind., Inc.*, 480 F.3d 695, 699 (5th Cir. 2007). "The warranty against redhibitory defects covers only defects that exist at the time of delivery." La. Civ. Code art. 2530. A buyer has a duty to inspect the item for defects. *See, e.g., Crow v. Laurie,* 729 So. 2d 703, 707-08 (La. App. 1999) (citing *Pursell v. Kelly*, 152 So. 2d 36, 41 (La. 1963)). Whether an inspection is reasonable depends on the facts of the case, including such factors as the knowledge and expertise of the buyer, the opportunity for inspection, and the assurances made by the seller. *See Merlin v. Fuselier Constr., Inc.,* 789 So. 2d 710, 715 (La. App. 2001); *see also Lemaire v. Breaux,* 788 So. 2d 498, 501 (La. App. 2001) (requiring the buyer to conduct an investigation "as would be conducted by a reasonably prudent buyer acting under similar circumstances"). Although the LPLA is the exclusive remedy for damages caused by a product, redhibition claims are preserved to plaintiffs but "only to the extent the claimant seeks to recover the value of the product or other economic loss." *De Atley v. Victoria's Secret Catalogue, LLC*, 876 So. 2d 112, 115 (La. App. 2004); *see also NAZ LLC v. Philips Healthcare*, 2018 WL 5847862, at *7 (E.D. La. Nov. 18, 2018) (discussing the LPLA's limiting effect on a redhibition claim, and stating "a plaintiff must bring an action under the LPLA to recover all damages caused by a product, except for damage to the product itself and economic loss sought under the Chapter 9 Redhibition articles").

      The Crosby interests have produced no evidence that the 54-inch all-around navigation light pole or its placement on the center console rendered the Fishmaster useless or so inconvenient that a reasonable buyer would not have purchased it. As installed by the manufacturer of the boat, that light would have been well above the operator's head. It was an obvious feature of the vessel

when Toups bought it from his friend. Further, the original light pole was no longer on the vessel at the time of the accident and thus could have had nothing to do with the accident. Williams had replaced it with a shorter pole and had also attached a makeshift temporary light to the shorter pole. These changes to the Fishmaster – made after the boat left the manufacturer's hands when sold new in 2004 – are factors the Crosby interests allege to have contributed to the accident. Therefore, Tracker Marine is entitled to summary judgment on the Crosby interests' redhibition claim.

## IV.   CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Tracker Marine's motion for summary judgment (R. Doc. 350) is GRANTED, and all claims against it are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Tracker Marine's motion to exclude third-party plaintiffs' liability expert Nicholas Engels (R. Doc. 343) is DISMISSED AS MOOT.

IT IS FURTHER ORDERED that Tracker Marine's motion to exclude third-party plaintiffs' expert Dr. Clifford A. Hendricks (R. Doc. 344) is DISMISSED AS MOOT.

New Orleans, Louisiana, this 19th day of May, 2021.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE